UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REBECCA SCIFO, individually and on behalf of all others similarly situated,<br><br>         Plaintiff,<br><br>v.<br><br>ALVARIA, INC. and CARRINGTON MORTGAGE SERVICES, LLC,<br><br>         Defendants. | CASE NO.: |

## COMPLAINT

Plaintiff Rebecca Scifo ("Plaintiff"), by her undersigned counsel, files this Class Action Complaint on behalf of herself and a class of similarly situated persons against Alvaria, Inc. ("Alvaria") and Carrington Mortgage Services, LLC ("Carrington") (collectively "Defendants"). Plaintiff bases the forgoing allegations upon personal information and belief, the investigation of counsel, and states the following:

## INTRODUCTION

1.      Alvaria is a workforce management and call center technology solution company. It provides these services to Carrington, which is the current owner of Plaintiff's home mortgage.

2.      On March 9, 2023, third party hackers breached Alvaria's data system, including a portion of Alvaria's customer environment that maintained customer's workforce management and/or outbound dialer data ("Data Breach"). Some of the data the hackers procured or exfiltrated was associated with Carrington and included Plaintiff's data.

3.      This is the second security incident at Alvaria in four months. Last November, the company suffered a hack by the Hive Ransomware group. That incident impacted nearly 5,000

customers.[1]

4.      The types of data impacted by the Data Breach included names, mailing addresses, telephone numbers, loan numbers, current loan balances, and the last four digits of Social Security Numbers.  Neither Carrington nor Alvaria have disclosed the total number of customers and clients impacted by the Data Breach.  However, Alvaria did report to the Massachusetts Attorney General that at least 4,167 Massachusetts residents were impacted by the Data Breach.[2]

5.       Because the Data Breach compromised Plaintiff's Sensitive Information, Plaintiff and the Class (defined below) have been placed in an immediate and continuing risk of harm from fraud, identity theft, and related harm caused by the Data Breach.

6.      As a result of Defendants' conduct, Plaintiff and the Class have and will be required to continue to undertake time-consuming and often costly efforts to mitigate the actual and potential harm caused by the Data Breach.  This includes efforts to mitigate the breach's exposure of their Sensitive Information, including by, among other things, placing freezes and setting alerts with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, reviewing and monitoring credit reports and accounts for unauthorized activity, changing passwords on potentially impacted websites and applications, and requesting and maintaining accurate records.

7.      Plaintiff therefore brings this Class Action seeking relief for her injuries and those of persons who were similarly impacted by the Data Breach and Defendants' inadequate data security.

**<u>JURISDICTION</u>**

8.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §

---

[1]   *Tech vendor names Carrington in data breach notice*, NEXT, May 3, 2023, https://nextmortgagenews.com/news/tech-vendor-names-carrington-in-data-breach-notice/ (last visited May 5, 2023).

[2] Andrew Martinez, *Carrington Reports Ransomware Attack at Tech Vendor*, NATIONAL MORTGAGE NEWS, May 2, 2023, https://www.nationalmortgagenews.com/news/carrington-mortgage-reports-ransomware-data-breach (last visited May 5, 2023).

1332, as amended by the Class Action Fairness Act of 2005. Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds five million dollars ($5,000,000), excluding interest and costs; (2) there are more than 100 Class members; (3) at least one member of the Class is diverse from the Defendants; and (4) the Defendants are not a government entity.

9.      Alvaria is a Delaware corporation with its principal place of business in Westford, Massachusetts.

10.     Carrington is a limited liability company organized under the laws of Delaware with its principal place of business in Anaheim, California.

11.     This Court has personal jurisdiction over Defendants because Defendants' acts or omissions and false or misleading representations regarding the security of Plaintiff's and Class members' PII alleged herein occurred in Massachusetts. Defendant Alvaria has a principal place of business in Massachusetts.  Defendant Carrington does regular business with Alvaria (a Massachusetts company), is registered to do business in Massachusetts, has a registered agent for service of process in Massachusetts, and transacts business in Massachusetts, and contracts to supply services or things in Massachusetts, as provided in M.G.L., c. 233A, §§ 3(a) and (b).

12.     This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District and because Defendants reside and/or are registered to do business and transact business in this District.

<u>**PARTIES**</u>

13.     Plaintiff Rebecca Scifo is and has been for all relevant times a resident of Chancellor, South Dakota and is a citizen of South Dakota.  Carrington currently owns Ms. Scifo's home mortgage and has owned her mortgage for approximately the last three years.  Ms. Scifo received a notice letter from Alvaria on May 2, 2023, indicating that her data, including her name, mailing address, telephone number, loan number, current loan balance, and the last four digits of her Social Security Number had been implicated in Alvaria's March 9, 2023 data breach.  The

3

notice Ms. Scifo received from Alvaria ("Notice") is attached hereto as **Exhibit A**.  Since notice of the Data Breach, Plaintiff has spent time and effort monitoring her accounts for identity theft or fraud.

14.     Defendant Alvaria is a corporation with its headquarters and principal place of business at 5 Technology Park Drive, Westford, Massachusetts 01886.

15.     Defendant Carrington is a limited liability company formed in Delaware with its principal and mailing address located in Anaheim, California.

## BACKGROUND

**A.     Defendants Collected, Maintained, and Stored Sensitive Information.**

*Carrington*

16.     In providing its loan and financial services, Carrington collects sensitive personal information from customers.  This information includes name, email address, username, password, social security number, phone number, mailing address, financial information and history, employment information drivers' license information, insurance information, marital status, and other personal and highly sensitive information a person might provide when trying to procure a loan or mortgage.  Carrington hosts a large repository of sensitive personal information for its customers.  Carrington also contracts with Alvaria for certain call center related services, by which Carrington authorizes Alvaria to receive and store Carrington's customers' data.

*Alvaria*

17.     Alvaria claims to be the "world leader in enterprise-scale customer experience and workforce engagement management."  It states that it is a "technology innovator[] in call center software, cloud contact center solutions, workforce optimization and customer service experience."[3]

18.     According to Alvaria, it serves 4 of 5 top commercial banks, 8 of 10 top telecom providers, 6 of 6 top airline carriers, 4 of 5 top healthcare providers, and 4 of 5 top general

---

[3] https://www.linkedin.com/company/alvaria-inc.

merchandisers.[4]

19.     In providing its services, Alvaria collects information from its clients, including Carrington, that may include sensitive information like name, mailing address, social security numbers, loan information, and other related information that customers provided directly to Carrington.

**B.     Defendants Knew They Needed to Protect Customers' Sensitive Information and Committed to Protecting that Information.**

*Carrington*

20.     Carrington has a Privacy Policy on its website that states that it respects "the privacy of each user."[5]

21.     Carrington also makes other representations related to customer privacy including:

(a)     Ensuring the privacy of [customer] confidential information is one of Carrington Mortgage Services, LLC's top priorities;

(b)     We comply with all applicable federal, state, and local laws, and have numerous internal safeguards in place to protect your personal information.  Carrington Mortgage Services, LLC's Privacy Officer oversees all aspects of our privacy policy throughout the company.  We treat confidential customer information with the utmost discretion and caution, and we hold our business partners (presumably like Alvaria) to these same high standards.[6]

22.     Carrington knew it needed to protect the privacy of Plaintiff and the Class and further committed to holding its partners, like Alvaria, to the very same privacy protection standards it follows.

*Alvaria*

23.     Alvaria's Privacy Policy commits to "keeping [customers] personal information

---

[4] https://www.alvaria.com/company/about-alvaria.

[5] https://www.carringtonmortgage.com/legal/privacy-policy.

[6] https://www.carringtonmortgage.com/legal/best-practices#protectingPrivacy.

confidential and secure." The Policy further explains that Alvaria maintains "appropriate physical, electronic, procedural, technical and organizational measures to help safeguard person information from loss, theft, misuse, unauthorized access, disclosure, alteration and destruction."[7]

24.     Alvaria knew the information from Carrington customers was highly sensitive and that it was required by law to maintain the privacy and confidentiality of that information.

**C.     Defendants' Inadequate Data Security Measures Exposed Customers' Sensitive Information.**

25.     On March 9, 2023, a malicious actor gained unauthorized access to Alvaria's data systems, which included customer databases. By doing so, the actor gained access to the sensitive personal, financial, and other information of Carrington's clients' current and former customers.

26.     Upon information and belief, the actors viewed, copied, and exfiltrated substantial amounts of Plaintiff's and the Class's PII. This included highly sensitive information such as names, mailing addresses, loan information, and partial Social Security Numbers.

27.     This is not Alvaria's first data breach. In November of 2022, Alvaria's data system was breached, but that instance was purportedly limited to disclosure of certain corporate clients' information. Upon information and belief, Carrington was aware of the November 2022 breach of Alvaria's data systems.

28.     Neither Alvaria nor Carrington immediately disclosed this new March 2023 Data Breach to the victims impacted by the unauthorized disclosure. Rather, Alvaria waited until April 26, 2023 to publicly post notice of the breach, approximately seven weeks after it learned of the Data Breach. Additionally, neither of the Defendants have disclosed the scope of the breach or the total number of impacted consumers.

29.     The April 26, 2023 notice that Alvaria provided to Plaintiff and the Class members suggested they take time consuming steps to help protect their information, including enrolling in identity monitoring services, obtaining a free credit report, setting up fraud alerts, and issuing a security freeze.

---

[7] https://www.alvaria.com/legal/privacy-policy.

30.     Given that Defendants purposefully obtained and stored the PII of Plaintiff and the Class and knew or should have known of the serious risk and harm caused by a data breach, Defendants were obligated to implement reasonable measures to prevent and detect cyberattacks. This includes measures recommended by the Federal Trade Commission and promoted by data security experts and other agencies. This obligation stems from the foreseeable risk of a data breach given that Defendants collected, stored, and had access to a swath of highly sensitive patient records and data and, additionally, because other highly publicized data breaches at different institutions put Defendants on notice that the highly personal data they stored, or allowed other entities to store via a services contract or relationship, might be targeted by cybercriminals.

31.     Despite the highly sensitive nature of the information Defendants obtained, created, and stored, and the prevalence of data breaches at financial institutions like Carrington or related businesses, Defendants inexplicably failed to take appropriate steps to safeguard the PII of Plaintiff and the Class.  The Data Breach itself and information Defendants have disclosed about the breach to date, including its length, the need to remediate Defendants' cybersecurity, and the sensitive nature of the impacted data, collectively demonstrate Defendants failed to implement reasonable measures to prevent the Data Breach and the exposure of highly sensitive customer information.

**D.     Exposure of PII and other Sensitive Information Created a Substantial Risk of Harm.**

32.     The personal and financial information of Plaintiff and the Class is valuable and has become a highly desirable commodity to data thieves.

33.      Defendants' failure to reasonably safeguard Plaintiff's and the Class's sensitive PII has created a serious risk to Plaintiff and the Class, including both a short-term and long-term risk of identity theft and other fraud.

34.     Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

35.     According to experts, one out of four data breach notification recipients becomes a victim of identity fraud.[8]

36.     Stolen Sensitive Information is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines and is frequented by criminals, fraudsters, and other wrongdoers. Law enforcement has difficulty policing the "dark web," which allows users and criminals to conceal identities and online activity.

37.     Purchasers of Sensitive Information use it to gain access to the victim's bank accounts, social media, credit cards, and tax details. This can result in the discovery and release of additional Sensitive Information from the victim, as well as Sensitive Information from family, friends, and colleagues of the original victim. Victims of identity theft can also suffer emotional distress, blackmail, or other forms of harassment in person or online. Losses encompass financial data and tangible money, along with unreported emotional harm.

38.     The FBI's Internet Crime Complaint (IC3) 2019 report estimated there was more than $3.5 billion in losses to individual and business victims due to identity fraud in that year alone. The same report identified "rapid reporting" as a tool to help stop fraudulent transactions and mitigate losses.

39.     Defendant did not rapidly report to Plaintiff and the Class that their Sensitive Information had been exposed or stolen, but instead seven weeks to make a public notice related to the Data Breach, and even that notice did not include the number of impacted victims.

40.     The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour reiterated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be

---

[8] *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims,* ThreatPost.com (last visited Jan. 17, 2022), https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/.

commercially valuable. Data is currency."[9]

41.     The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business. According to the FTC, reasonable data security protocols require:

(1)     encrypting information stored on computer networks;

(2)     retaining payment card information only as long as necessary;

(3)     properly disposing of personal information that is no longer needed or can be disposed of pursuant to relevant state and federal law;

(4)     limiting administrative access to business systems;

(5)     using industry tested and accepted methods;

(6)     monitoring activity on networks to uncover unapproved activity;

(7)     verifying that privacy and security features function properly;

(8)     testing for common vulnerabilities; and

(9)     updating and patching third-party software.[10]

42.     The United States Cybersecurity & Infrastructure Security Agency, and other federal agencies, recommend similar and supplemental measures to prevent and detect cyberattacks, including, but not limited to: implementing an awareness and training program, enabling strong spam filters, scanning incoming and outgoing emails, configuring firewalls, automating anti-virus and anti-malware programs, managing privileged accounts, configuring access controls, disabling remote desktop protocol, and updating and patching computers.

43.     The FTC cautions businesses that failure to protect Sensitive Information and the resulting data breaches can destroy consumers' finances, credit history, and reputations, and can

[9] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009) (last visited June 7, 2022) https://www.ftc.gov/news-events/news/speeches/remarks-ftc-exploring-privacy-roundtable.

[10] *Start With Security, A Guide for Business,* FTC (last visited June 7, 2022) https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

take time, money, and patience to resolve the fallout.[11]    Indeed, the FTC treats the failure to implement reasonable and adequate data security measures—like Defendants failed to do here— as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

**E.      Plaintiff and the Class's PII are Valuable.**

44.      Birth dates, Social Security numbers, addresses, employment information, income, and similar types of information can be used to open several credit accounts on an ongoing basis rather than exploiting just one account until it's canceled.[12]

45.      For that reason, cybercriminals on the dark web are able to sell data like Social Security numbers for large profits.

46.      Consumers place a considerable value on their Sensitive Information and the privacy of that information. One 2002 study determined that U.S. consumers highly value a website's protection against improper access to their Sensitive Information, between $11.33 and $16.58 per website. The study further concluded that to U.S. consumers, the collective "protection against error, improper access, and secondary use of personal information is worth between $30.49 and $44.62.[13]   This data is approximately twenty years old, and the dollar amounts would likely be exponentially higher today.

47.      Defendant's Data Breach exposed a variety of Sensitive Information, including Social Security numbers and PII.

48.      The Social Security Administration ("SSA") warns that a stolen Social Security number can lead to identity theft and fraud: "Identity thieves can use your number and your credit

---

[11] Taking Charge, What to Do if Your Identity is Stolen, FTC (last visited June 7, 2022), https://www.consumer.ftc.gov/sites/default/files/articles/pdf/pdf-0014-identity-theft.pdf.

[12] *Anthem hack: Personal data stolen sells for 10x Price of Stolen Credit Card Numbers,* Tim Greene, https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited June 7, 2022).
[13] 11-Horn Hann, Kai-Lung Hui, et al, *The Value of Online Information Privacy: Evidence from the USA and Singapore,* at 17. Marshall Sch. Bus., Univ. So. Cal. (Oct. 2002), https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited June 7, 2022).

to apply for more credit in your name."[14]  If the identity thief applies for credit and does not pay the bill, it will damage victims' credit and cause a series of other related problems.

49.     Social Security numbers are not easily replaced. In fact, to obtain a new number, a person must prove that he or she continues to be disadvantaged by the misuse—meaning an individual must prove actual damage has been done and will continue in the future.

50.     Plaintiff and the Class now face years of monitoring their financial and personal records with a high degree of scrutiny.  The Class has incurred and will incur this damage in addition to any fraudulent use of their Sensitive Information.

## CLASS ALLEGATIONS

51.     Plaintiff brings this action on behalf of himself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Nationwide Class:

> All individuals whose data was impacted or otherwise compromised
> by the Data Breach.

52.     Excluded from the class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

53.     Plaintiff reserves the right to, after conducting discovery, modify, expand or amend the above Class definition or to seek certification of a class or Classes defined differently than above before any court determines whether certification is appropriate.

54.     **Numerosity.** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiff believes that there are thousands of members of the Class, if not more. The number of impacted individuals remains unknown and unreported, and Plaintiff believes additional entities and persons may have been affected by the Data Breach. The precise number of class members, however, is

---

[14] Social Security Administration, Identity Theft and Your Social Security Number, (last visited June 7, 2022), https://www.ssa.gov/pubs/EN-05-10064.pdf.

unknown to Plaintiff. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

55.     **Commonality and Predominance**. Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members.  These common questions include, without limitation:

a.     Whether Defendants knew or should have known that their data environment and cybersecurity measures, or those created by corporate service providers, created a risk of a data breach;

b.     Whether Defendants controlled and took responsibility for protecting Plaintiff's and the Class's data when they solicited that data, collected it, stored it on its servers, and authorized a third party to collect and store that data;

c.     Whether Defendants' security measures were reasonable considering the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

d.     Whether Defendants owed Plaintiff and the Class a duty to implement reasonable security measures;

e.     Whether Defendants' failure to adequately secure Plaintiff's and the Class's data constitutes a breach of its duty to institute reasonable security measures;

f.     Whether Defendants' failure to implement reasonable data security measures allowed the breach of their data systems to occur and caused the theft of Plaintiff's and the Class's data;

g.     Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

h.     Whether Plaintiff and the Class were injured and suffered damages or other losses because of Defendants' failure to reasonably protect its data systems; and

       i.        Whether Plaintiff and the Class are entitled to relief.

      56.     **Typicality**.  Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a typical member of the Class.  Plaintiff and the Class are each persons whose provided data to Carrington, whose data resided on Carrington's and Alvaria's servers, and whose personally identifying information was exposed in Defendants' Data Breach.  Plaintiff's injuries are similar to other class members and Plaintiff seeks relief consistent with the relief due to the Class.

      57.     **Adequacy**.  Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendants to obtain relief for himself and for the Class.  Plaintiff has no conflicts of interest with the Class.  Plaintiff has also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

      58.     **Superiority**.  Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous members of the Class.  Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

      59.     **Injunctive and Declaratory Relief**.  Consistent with Fed. R. Civ. P. 23(b)(2), Defendants, through their conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## LEGAL CLAIMS

### COUNT I

**Negligence**

60.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

61.     Defendants owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the sensitive data it solicited from Plaintiff and the Class and managed and stored.  This duty arises from multiple sources.

62.     Defendants owed a common law duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that hackers would target Defendants' data systems and servers containing Plaintiff's and the Class's sensitive data and that, should a breach occur, Plaintiff and the Class would be harmed.  Defendants controlled their technology, infrastructure, and cybersecurity, and to the extent Carrington outsourced its data security to Alvaria, Carrington made the decision to outsource that service.

63.     Defendants further knew or should have known that if hackers breached their data systems, they would extract sensitive data and inflict injury upon Plaintiff and the Class. Furthermore, Defendants knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen.  Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of Defendants' ineffective, unreasonable data security measures.

64.     Additionally, Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, required Defendants to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of Defendants' duty to Plaintiff and the Class.  Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants failing to use reasonable measures to protect sensitive data.  Defendants, therefore, were required and obligated to take reasonable

measures to protect data they possessed, held, or otherwise used.  The FTC publications and data security breach orders described herein further form the basis of Defendants' duty to adequately protect sensitive information.  By failing to implement reasonable data security measures, Defendants acted in violation of § 5 of the FTCA.

65.     Defendants are obligated to perform their business operations in accordance with industry standards.  Industry standards are another source of duty and obligations requiring Defendants to exercise reasonable care with respect to Plaintiff and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class.

66.     Finally, Defendants assumed the duty to protect sensitive data by soliciting, collecting, and storing users' data and, additionally, by representing to consumers that it lawfully complied with data security requirements and had adequate data security measures in place to protect the confidentiality of Plaintiff's and the Class's private and sensitive information.

67.     Defendants breached their duty to Plaintiff and the Class by implementing unreasonable data security measures that they knew or should have known could cause a Data Breach.  Defendants knew or should have known that hackers might target sensitive data that Carrington solicited and collected, which was later collected and stored by Alvaria, on customers and, therefore, needed to use reasonable data security measures to protect against a Data Breach. Indeed, Defendants acknowledged they were subject to certain standards to protect data and utilize other industry standard data security measures.

68.     Defendants were fully capable of preventing the Data Breach. Alvaria, as a technology utilizing company, and Carrington, a massive and savvy financial entity, knew or should have known of data security measures required or recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented, would have prevented the Data Breach from occurring at all, or limited and shortened the scope of the Data Breach. Defendants thus failed to take reasonable measures to secure its system, leaving it vulnerable to a breach.

69.     As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes.

70.     Plaintiff and the Class members have suffered damages as a result of Defendants' negligence, including actual and concrete injuries and will suffer additional injuries in the future, including economic and non-economic damages from invasion of privacy, costs related to mitigating the imminent risks of identity theft, time and effort related to mitigating present and future harms, actual identity theft, the loss of the benefit of bargained for security practices that were not provided as represented, and the diminution of value in their PII.

## COUNT II
### Declaratory and Injunctive Relief

71.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

72.     Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

73.     An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendants' common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class.  Plaintiff alleges Defendants' actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

74.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.     Defendants owed, and continue to owe a legal duty to secure the sensitive information with which they are entrusted, specifically including information obtained from its customers, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

b.     Defendants breached, and continue to breach, their legal duty by failing to employ reasonable measures to secure their customers' personal information; and,

c.     Defendants' breach of their legal duty continues to cause harm to Plaintiff and the Class.

75.     The Court should also issue corresponding injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect its users' data.

76.     If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendants' data systems. If another breach of Defendants' data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

77.     The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued.

78.     Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

## **PRAYER FOR RELIEF**

79.     Wherefore, Plaintiff, on behalf of herself and the Class, requests that this Court award relief as follows:

a.    An order certifying the class and designating Plaintiff as the Class Representative and her counsel as Class Counsel;

b.    An award to Plaintiff and the proposed Class members of damages with pre-judgment and post-judgment interest;

c.    A declaratory judgment in favor of Plaintiff and the Class;

d.    Injunctive relief to Plaintiff and the Class;

e.    An award of attorneys' fees and costs as allowed by law; and

f.    An award such other and further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial for all the claims so triable.

Dated: May 22, 2023                    Respectfully submitted,

/s/ David Pastor
David Pastor, BBO #391000
**PASTOR LAW OFFICE, PC**
63 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Telephone: (617) 742-9700
Facsimile: (617) 742-9701
Email:  dpastor@pastorlawoffice.com

Brian C. Gudmundson
(*Pro hac vice* forthcoming)
Michael J. Laird
(*Pro hac vice* forthcoming)
Rachel K. Tack
(*Pro hac vice* forthcoming)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
Email:  brian.gudmundson@zimmreed.com
Email:  michael.laird@zimmreed.com
Email:  rachel.tack@zimmreed.com

Abbas Kazerouian
(*Pro hac vice* forthcoming)
Mona Amini
(*Pro hac vice* forthcoming)
**KAZEROUNIAN LAW GROUP, APC**
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808 Ext: 2
Facsimile: 800-520-5523
Email:  ak@kazlg.com
Email:  mona@kazlg.com

***Attorneys for Plaintiff and the Proposed Class***